# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**PATRICIA HOVI**
              **Plaintiff,**


       **v.**                                    **Case No. 12-C-169**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

On September 15, 2006, plaintiff Patricia Hovi applied for social security disability benefits, claiming that she became disabled as of July 23, 2006, due to a variety impairments, including, inter alia, osteoarthritis, degenerative disc disease, fibromyalgia, gout, obesity, diabetes, and depression. Plaintiff's medical records also revealed a history of alcohol abuse. Following denials at the initial and reconsideration levels, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

In a decision issued on June 2, 2009, the ALJ found that plaintiff suffered from multiple severe physical impairments, which limited her to a range of sedentary work. The ALJ further found that, factoring in her alcohol abuse, plaintiff was limited to simple, routine (unskilled) tasks, which precluded her from returning to her past (semi-skilled) work. A person of plaintiff's age (fifty-seven at the time of the hearing), limited to sedentary work and unable to perform her past jobs, will generally be deemed disabled under the SSA's Medical-Vocational Guidelines. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.06. However, the ALJ concluded that, if she stopped the substance abuse, plaintiff would not

be limited to simple, routine tasks and thus could perform her previous, semi-skilled work. Because the law precludes an award of benefits to a person who would not be disabled absent drug addiction or alcoholism, see 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535; Kangail v. Barnhart, 454 F.3d 627, 628 (7th Cir. 2006), the ALJ denied plaintiff's application.  The Appeals Council denied review, making the ALJ's decision the final word on plaintiff's 2006 application.  See Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012).

Plaintiff subsequently re-applied for benefits, and the SSA found her disabled as of June 3, 2009, the day after the ALJ's decision on the 2006 application.  (Tr. at 348.) Plaintiff now seeks judicial review of the ALJ's decision on the 2006 application, arguing that the ALJ erred (1) in finding her substance abuse a contributing factor material to her disability, (2) in determining her residual functional capacity ("RFC"), and (3) in evaluating her credibility.  While I find the ALJ's decision generally supported by substantial evidence and consistent with applicable law, on one RFC issue I find that the matter must be remanded for further proceedings.

## I.  FACTS AND BACKGROUND

### A.   Medical Evidence

#### 1.     Treatment Records

Because the period now at issue is July 23, 2006 through June 2, 2009, I will focus on the records from that general time frame.  The 1366-page administrative transcript includes records dating back many years, including material related to a 1989 application, on which plaintiff received benefits for several years before she returned to work.  (Tr. at 218, 232.)  Nevertheless, a brief discussion of the pre-2006 records is appropriate, given

2

some of plaintiff's arguments.

In July 1996, based on the failure to conservative treatment to remedy her complaints of back and bilateral leg pain, plaintiff underwent a right L4-L5 decompressive hemilaminectomy with excision of a herniated disc fragment. (Tr. at 676.) Her back pain later returned however (Tr. at 493), with an October 4, 2002, lumbar MRI revealing moderately severe spinal stenosis at L3-L4. (Tr. at 490-91.)

On January 24, 2003, plaintiff saw Dr. Charles Moore, a rheumatologist, for further evaluation of migratory joint pain. (Tr. at 494.) On examination, she had fourteen trigger points, with Dr. Moore assessing "evolving fibromyalgia" (Tr. at 495) and recommending exercise and physical therapy (Tr. at 496).

On December 4, 2003, plaintiff underwent a psychological assessment prior to bariatric surgery. (Tr. at 904.) She reported regularly drinking to intoxication. She further reported taking Prozac, which she said was effective for treating her depression. (Tr. at 905.) She denied problems with attention, concentration, or memory. (Tr. at 906.) Dr. Daniel D'Allaird offered a provisional diagnosis of alcohol abuse, as plaintiff denied impairment based on her drinking other than the financial strain. (Tr. at 909.)

On October 20, 2005, plaintiff was admitted to the St. Luke's emergency room, highly intoxicated with a BAC of 0.300. Dr. Charles Wolfe placed her in detox for a 72 hour hold. (Tr. at 775-76.) During a follow-up appointment on November 8, 2005, plaintiff indicated that she had been sober since her release from detox. However, she complained of stress due to a divorce and her sister's illness. She also requested a prescription for Flexeril due to muscle soreness. (Tr. at 614.)

In November 2005, plaintiff began receiving mental health treatment at St. Luke's

3

Hospital, with Dale DeRocher, a psychologist, diagnosing major depressive disorder, recurrent, moderate; and alcohol abuse, with a GAF of 60.[1]  Plaintiff complained of low motivation, fluctuations in energy level, lack of interest in once pleasurable activities, poor concentration, and a decline in memory.  She also reported heavy drinking three to four times per week.  (Tr. at 599.)  She was at the time working as a transcriptionist.  On mental status exam, she demonstrated good interpersonal skills, normal speech and thought processes, and sufficient insight and motivation to benefit from therapy.  (Tr. at 600.)  During subsequent counseling sessions in late 2005 and early 2006, plaintiff complained of further stress based on changes at her job and reduction in her pay.  She also admitted continued heavy drinking at times.  (Tr. at 590-98.)  On March 2, 2006, plaintiff was taken to the St. Luke's ER after being found unconscious in her room.  She admitted drinking, and her BAC was 0.24.  (Tr. at 773-74, 788.)  On June 5, 2006, during a session with Dr. DeRocher, plaintiff reported excruciating fibromyalgia pain, as well as issues at work, and using alcohol to cope.  (Tr. at 586.)

On July 31, 2006, plaintiff saw her primary care physician, Dr. Sonja Swenson, for follow up of her diabetes.  She stated that she had quit her job and was in the process of switching companies to make more money.  She also complained of a recent gout flare, for which she requested medication. (Tr. at 606.)

On September 5, 2006, plaintiff complained of left great toe pain and swelling.  Dr.

---

[1]GAF – the acronym for "Global Assessment of Functioning" – rates the severity of a person's symptoms and her overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others.  Scores of 51-60 reflect "moderate" symptoms and 61-71 "mild" symptoms.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

Swenson ordered an MRI, which revealed possible osteomyelitis, soft tissue swelling, and small to moderate-sized joint effusion (Tr. at 623), and Dr. Joel Zamzow subsequently performed a debridement of a left great toe ulcer (Tr. at 766-72, 1073-86).  On September 12, Dr. Scott Wolff checked her wound, finding that she had developed MRSA and providing Clindamycin.  (Tr. at 764, 1092-93.)  Subsequent checks found her wound healing well.  (Tr. at 628.)

On September 21, 2006, plaintiff returned to Dr. Swenson, complaining of anxiety and depression.  She was at the time taking Prozac but asked for Cymbalta, which Dr. Swenson prescribed, indicating that the medication may also help with plaintiff's complaints of chronic pain.  (Tr. at 604.)

On October 10, 2006, plaintiff saw Dr. Patricia Fields, a psychiatrist, indicating that she had experienced anxiety and depression since her teen years, for which she took various medications.  Plaintiff indicated that she used to work for St. Luke's as a transcriptionist, but they lowered her pay and she quit.  (Tr. at 1060.)  On mental status exam, plaintiff's mood was depressed and anxious, her insight and judgment intact, her memory intact in all spheres, and concentration somewhat impaired.  Dr. Fields assessed major depressive disorder, recurrent, moderate; and post-traumatic stress disorder, with a GAF of 60 (Tr. at 1061), continuing plaintiff on her current medications (Tr. at 1062).  On December 14, 2006, Dr. Larry Broome, a psychiatrist, continued plaintiff on Vistaril, Ambien, and Prozac.  (Tr. at 1059.)

On January 8, 2007, plaintiff established primary care with Dr. Sandy Popham.  Her diabetes was well controlled, but she complained of fairly severe arthritis for which she used Ibuprofen.  She reported being on and off the wagon, drinking once per week to the

point of passing out but was not interested in treatment.  (Tr. at 1053.)

On January 9, 2007, plaintiff returned to Dr. Broome, stating that she had an interest in employment and was looking for the right job.  Dr. Broome diagnosed major depressive disorder, recurrent, in partial remission, with a GAF of 60, continuing plaintiff on Prozac, Ambien for sleep, and Vistaril for anxiety.  (Tr. at 1052-53.)

On April 2, 2007, plaintiff returned to Dr. Popham, with her diabetes well controlled. (Tr. at 1049-50.)   On July 2, she saw Dr. Broome, complaining of increased sadness/hopelessness over the past few months, with significant fatigue and poor concentration. Dr. Broome diagnosed major depressive disorder, recurrent, moderate, with a GAF of 52.  He continued Prozac, Ambien, and Vistaril, and started Bupropion.  (Tr. at 1038.)   On August 1, plaintiff advised Dr. Broome that she had improved on these medications and had started new part-time employment with a legal firm.  (Tr. at 1037.) Dr. Broome assessed major depressive disorder, recurrent, in partial remission, with a GAF of 62.   (Tr. at 1038.)

On November 2, 2007, plaintiff saw Dr. Othmane Alami, a psychiatrist, who renewed her medications.  (Tr. at 1028-29.)  On November 13, she saw Dr. Amida Gallito regarding her multiple physical problems, indicating that her main concern was her fibromyalgia, with increasing pain in the wrists, elbow, and shoulders.  (Tr. at 1024-25.)  Dr. Gallito requested a rheumatology consult.  (Tr. at 1026.)

On December 19, 2007, plaintiff returned to Dr. Alami, reporting stable mood with some episodes of sadness.  She reported working a few hours every day and seemed to like her job.  (Tr. at 1023.)  Dr. Alami noted that she continued to respond well to medications – Fluoxetine and Wellbutrin for depression, Ambien for sleep, and Hodroxizine

6

for anxiety.  (Tr. at 1024.)

On January 4, 2008, plaintiff underwent the rheumatology consult with Dr. Hollis Krug.  She indicated that she had been diagnosed with fibromyalgia at St. Luke's three to four years ago, and that the pain was now bothering her more.  (Tr. at 944.)  She reported working as a legal courier, about ten hours per week.  (Tr. at 944-45.)  On exam, Dr. Krug noted no swelling or tenderness in any joint. (Tr. at 947.)   In his assessment and recommendations, Dr. Krug listed fibromyalgia but noted that plaintiff's only specific complaint of pain was in the right forearm, consistent with tennis elbow, as well as complaints of decreased stamina.  She was taking Ibuprofen, which helped the pain.  Dr. Krug recommended a right forearm band to help treat the tendonitis, as well as increasing her level of activity.  He had no other treatment recommendations and saw no need for plaintiff to return to the rheumatology clinic.  (Tr. at 948-49.)  On January 18, plaintiff was fit for an elbow support.  (Tr. at 1014.)

On February 5, 2008, plaintiff saw Dr. Gallito for follow up, doing well, with no new complaints.  (Tr. at 1011.)  On March 20, she saw Dr. Alami, reporting that she had started a new, full-time job.  She indicated that she was on probation, which made her anxious, but she was happy she got a full-time job.  Dr. Alami noted that she continued to respond well to current medications, with a GAF of 65.  (Tr. at 1009.)  On May 5, plaintiff told Dr. Gallito she was doing well except for left lower quadrant pain.  (Tr. at 1003.)  She reported that she lost her job about a month ago, after which she drank one pint for four days.  (Tr. at 1004.)  Dr. Gallito ordered a pelvic ultrasound (Tr. at 1005), but plaintiff later called to cancel, reporting that the pain had resolved (Tr. at 1002).  On June 20, plaintiff also advised Dr. Alami that she had lost her job; for several days after she felt sad and angry,

7

but after overcoming the stress from her job loss her mood had been stable.  She reported drinking occasionally.  Dr. Alami noted that plaintiff continued to respond well to current medications.  (Tr. at 1000.)

On July 2, 2008, plaintiff returned to Dr. Gallito, complaining of arthritic pain, mostly in the right elbow, knees, and hips.  She had been evaluated by Rheumatology, and they felt most of her problems were due to osteoarthritis, but plaintiff stated she had been diagnosed with fibromyalgia at St. Luke's.  (Tr. at 996.)  On exam, she was ambulatory, not in acute pain or distress.  Dr. Gallito ordered labs and x-rays (Tr. at 997), continued pain medications, and attempted to obtain records from St. Luke's (Tr. at 998).

On July 3, 2008, plaintiff fractured her left ankle after falling off the commode while intoxicated.  Plaintiff reported drinking to relieve pain from a fibromyalgia flare.  However, aside from the fibromyalgia flare, she did not consider herself acutely ill.  (Tr. at 807.)  Dr. David Gordon performed an open reduction internal fixation using plates and screws (Tr. at 806), and plaintiff subsequently underwent about six week of rehabilitation (Tr. at 847-49, 1107-08).  During an August 5 follow up with Dr. Gordon, she was noted to be doing well, with less pain, but still unable to handle stairs.  (Tr. at 864.)  By September 2008, her ankle had improved, but she reported increased pain in the knees and hips.  (Tr. at 862-63.)

On September 9, 2008, plaintiff saw Dr. Eric Gutscher for hip pain, requesting Vicodin.  Dr. Gutscher diagnosed degenerative arthritis, especially in the knees and hips, diabetes, hypertension, and obesity, prescribing Vicodin.  (Tr. at 993.)

On September 15, 2008, plaintiff returned to Dr. Alami.  (Tr. at 990.)  She reported that her medical condition coupled with job loss made her depressed, but she seemed

8

back at her baseline.  She reported compliance with her medications, with no side effects. On mental status exam, she demonstrated good memory/concentration and fair insight/judgment.  Dr. Alami diagnosed major depressive disorder, recurrent, with a GAF of 65.  (Tr. at 991.)

On September 26, 2008, plaintiff saw Dr. Gallito for follow up after her ankle injury. She had returned to her home but was using a quad cane.  She reported no other concerns aside from right knee pain.  She also reported drinking less.  Dr. Gallito advised her to abstain, continued her current medications, and ordered an x-ray of the right knee. In the assessment section of the note, he listed right knee pain, recent fracture of the left ankle, diabetes, and fibromyalgia.  (Tr. at 986-88.)

On October 3, 2008, plaintiff advised Dr. Alami that she drank excessively after her ankle injury to deal with pain.  (Tr. at 983-84.)   On exam, he found her memory and concentration to be good.  He continued her medications: Fluoxetine and Wellbutrin for depression, Ambien for sleep, and Hodroxizine for anxiety, and noted that she was to be started on Gabapentin for neuropathic pain. (Tr. at 984.)

On October 7, 2008, plaintiff returned to Dr. Gallito, with the chief complaint of a cough.  Dr. Gallito also raised the issue of plaintiff receiving Hydrocodone from multiple sources.  (Tr. at 977.) He refused to prescribe narcotics, advising her to follow up with the orthopedic clinic for pain.  (Tr. at 979.)

On October 29, 2008, plaintiff saw Dr. Gordon for follow up, doing well, with no problems.  She was using a cane, but this was more for her other joints rather than her ankle.  Dr. Gordon indicated that she could gradually resume her normal activities without limitation.  (Tr. at 861.)

On November 7, 2008, plaintiff saw Dr. Gallito, complaining of right knee pain.  (Tr. at 967.)  She was ambulatory, but using a cane.  Dr. Gallito continued medications and referred her to orthopedics.  (Tr. at 968.)

On November 11, 2008, plaintiff underwent an assessment at the Human Development Center ("HDC") – Douglas County, with Elizabeth Byler, MA, LPC.  (Tr. at 902.)   Plaintiff stated she had struggled with depression for as long as she could remember.  She also reported drinking off and on since age fifteen.  She indicated that she had lost her last job as a transcriptionist due to slow processing speeds.  "She stated that she was slower because she was often hungover from drinking the night before."  (Tr. at 896.)  Plaintiff further stated that she "lost her job previously due to mistakes she was making while hungover."  (Tr. at 902.)  Ms. Byler found that plaintiff met the criteria for alcohol dependence, for which she had not been treated.  (Tr. at 896.)  Byler diagnosed depression, alcohol dependence, and borderline traits and histrionic traits, with a GAF of 50.  Plaintif appeared to have the desire to get sober and the support of her husband.  Byler was uncertain what type of depression plaintiff had, as she had been drinking for much of her adult life.  (Tr. at 898.)  Byler stated that it was clear that alcohol was a major problem but was unsure if she had a complete picture, recommending an AODA assessment.  (Tr. at 899.)

On November 12, 2008, plaintiff underwent an x-ray of the right knee, which showed degenerative changes (Tr. at 913), and saw Dr. David Fey for an orthopedic consult regarding her right knee pain (Tr. at 938).  Plaintiff described being quite sedentary, using a scooter to grocery shop.  She displayed a fair amount of difficulty getting on the exam table but could do so independently.  Dr. Fey assessed right knee degenerative changes,

recommending an injection rather than knee replacement.  Dr. Fey also noted a history of multiple body aches and pains; "question history of fibromyalgia. "  (Tr. at 939-40, 1015-16.)

On November 14, 2008, plaintiff returned to Dr. Alami, indicating that she had decided to stop drinking.  She also reported that her gait was improving, but she still had some joint pain affecting her sleep and ability to function.  (Tr. at 966-67.)

On December 5 and 15, 2008, plaintiff underwent an AODA assessment at HRC Chemical Dependency Services.  (Tr. at 900-01.)  Plaintiff admitted that her drinking was getting out of hand, causing physical, relationship, and work-related problems.   She reported periods of heavy drinking, followed by periods of sobriety.  Recently, she broke her ankle and after release from the hospital began self-medicating to deal with the pain.  "She has had other medical problems and has lost jobs as a result of her use."  (Tr. at 892.)  She also reported behavior changes when drinking.  (Tr. at 892.)  Plaintiff indicated that her last drink was on November 13.  The assessment found that plaintiff met the criteria for alcohol dependence.  The assessment further indicated that plaintiff's last job was at "Black Bear."  She was fired at the end of her sixty day probationary period for making too many mistakes.  "She reports she has had many jobs and indicates that she has been fired from a number of jobs as a result of her drinking."  (Tr. at 893.)  Plaintiff further reported "that she has always had a problem with concentrating and at times has some memory problems.  She is not sure if this is a result of any mental health [problem] or drinking."  (Tr. at 893.)  Plaintiff agreed to out-patient treatment, but when it came time for her to begin she was not willing to follow through, stating that she could not afford it and needed to decline.  (Tr. at 894.)

11

On December 17, 2008, plaintiff returned to Dr. Alami, who noted that she continued to respond well to medications – Fluoxetine and Wellbutrin for depression, Ambien for sleep, Hodroxizine for anxiety, and Gabapentin for neuropathic pain – with a GAF of 65. (Tr. at 965-66.)

On March 5, 2009, plaintiff returned to Dr. Gallito for follow up of diabetes and other conditions. She reported some improvement in knee pain from injections but lately started to have pain again, and Dr. Gallito referred her back to orthopedics. She also requested a referral to opthalmology after her sister was diagnosed with glaucoma. (Tr. at 935, 957, 958.) She reported that she had stopped taking Gabapentin and used no alcohol since November 12, 2008. On physical exam, Dr. Gallito found her ambulatory, not in acute distress or acute pain. (Tr. at 958.) He assessed diabetes, asthma, hypertension, obesity, gout, and chronic pain in the back, knee, ankle and shoulder, continuing her medications and providing orthopedic and opthalmology referrals. (Tr. at 959.)

On March 18, 2009, plaintiff returned to Dr. Alami, indicating that she was pain free after her leg fracture. She further reported being sober for weeks and getting along better with her husband. On mental status exam, her memory and concentration were good. Dr. Alami noted that plaintiff continued to respond well to current medications – Fluoxetine and Wellbutrin for depression, Ambien for sleep, Hodroxizine for anxiety, and Gabapentin for neuropathic pain – with a GAF of 65. (Tr. at 956-57.)

On April 1, 2009, plaintiff underwent another joint injection in her right knee, indicating that the previous injection had relieved her pain for two months. (Tr. at 954, 1175-76.)

12

### 2.    SSA Consultants

After she filed her application, the state agency arranged for plaintiff's claim to be reviewed by several consultants.  On October 26, 2006, William Merrick, Ph.D, completed a psychiatric review technique form, evaluating plaintiff under Listings 12.04 (Affective Disorders) and 12.05 (Anxiety-Related Disorders),[2] and finding no severe mental impairment.  (Tr. at 629.)  He found mild restriction of activities of daily living; social functioning; and concentration, persistence, and pace; with no episodes of decompensation.  (Tr. at 639.)  On October 31, 2006, Dr. Dar Muceno completed a physical RFC report, listing a primary diagnosis of diabetes and secondary diagnoses of gout and fibromyalgia, and finding plaintiff capable of sedentary work with no additional limitations.  (Tr. at 643-50.)  On August 8, 2007, Dr. Mina Khorshidi completed a physical RFC report, finding plaintiff capable of light work with no additional limitations.  (Tr. at 655-62.)  On August 13, 2007, Keith Bauer, Ph.D, affirmed Dr. Merrick's assessment.  (Tr. at 663.)

## B.    Hearing Testimony

On May 13, 2009, plaintiff appeared before the ALJ for her hearing.  (Tr. at 48.)  Plaintiff testified to past work as a medical transcriptionist and disability advocate (which she described as a clerical position, taking down information and typing it up).  (Tr. at 52, 75-76.)  She briefly worked as a receptionist in early 2008 but was let go after about two months for errors.  (Tr. at 53, 55.)  The ALJ eliminated this position as past relevant work due to the short time she performed it.  (Tr. at 53.)  Her last, previous full-time job was as

---

[2]Dr. Merrick did not check the box for Substance Addiction Disorders, Listing 12.09. (Tr. at 629.)

a medical transcriptionist for St. Luke's Hospital. (Tr. at 56.) She testified that she quit that job because she was unable to perform the work fast enough.[3] (Tr. at 57.)

Plaintiff indicated that she could no longer work due to her inability to sit long enough to accomplish much, incontinence due to the diuretics she took, and inability to pick things up due to carpal tunnel syndrome. (Tr. at 58.) She used splints for the carpal tunnel; they helped, but she continued to drop things (e.g., dishes, pens, books, mail). (Tr. at 58-59.)

Plaintiff indicated she could stand for about five minutes, double that with a cane. She testified that sitting was a problem due to her lumbar back surgery and poor circulation in her legs. (Tr. at 59-60.) Her ankle had healed following the fracture, and her diabetes was under pretty good control. (Tr. at 60.) She used a cane to help her walk due to pain in her legs and hip (Tr. at 61) and used a motorized cart when getting groceries (Tr. at 51). Plaintiff attributed her pain to osteoarthritis and fibromyalgia. Damp and cold weather made the pain worse. For pain relief, she took warm showers. (Tr. at 62.)

Plaintiff testified that she had been sober since October 2008. (Tr. at 62-63.) She indicated she previously drank to relieve pain. She denied that her depression was related to the alcohol abuse, indicating that she had personality troubles her entire life, which she described as not getting along with other people. (Tr. at 63-64.) She found it better not to work around a lot of other people due to her demeanor. This also helped her concentration due to fewer distractions. (Tr. at 64.)

Plaintiff testified that her medications caused some "slowness" in the morning, and

---

[3]In a pre-hearing submission, plaintiff indicated that she was fired on July 23, 2006, due to lack of productivity. (Tr. at 234-35.)

14

she tried not to drive when she first got up.  (Tr. at 64.)  She testified that she did little cleaning around the house, less than an hour per day, with rest breaks.  (Tr. at 65, 72.)  She did dishes while sitting on a stool by the sink.  She cooked meals that did not require her to stand by the stove.  Her husband did the laundry.  (Tr. at 65.)  She shopped at Walmart with a motorized cart.  (Tr. at 66, 69.)  She testified that she was going to a gym and working with a trainer to exercise and try to keep her mobility.  (Tr. at 66-67.)  Plaintiff testified that she was 5'3" tall and 264 pounds.  (Tr. at 54.)

The ALJ also summoned a vocational expert ("VE"), who classified plaintiff's past jobs as a medical transcriptionist and clerk/typist (disability advocate) as sedentary, semi-skilled work.  (Tr. at 76, 346.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age (fifty-four at the alleged onset date, fifty-seven at the hearing), with two years of post-secondary education, limited to sedentary work, with occasional stair climbing and postural movements, and occasional exposure to wetness or humidity.  (Tr. 76-77.)  The VE testified that such a person could perform both of plaintiff's past jobs.  (Tr. at 77.)  However, adding to the hypothetical a limitation to simple, routine tasks, past work could not be done, as this would limit the person to unskilled work.  (Tr. at 78.)  Plaintiff's counsel added a restriction to occasional fine fingering, grasping, and reaching, which the VE testified would eliminate the past jobs as they required frequent reaching, handling, and fingering.  (Tr. at 78.)

## C.   ALJ's Decision

On June 2, 2009, the ALJ issued an unfavorable decision.  Following the familiar five-step sequential evaluation process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity ("SGA") since July 23, 2006, the alleged onset

date.  The ALJ noted that plaintiff had significant earnings in 2006 but gave her the benefit of the doubt in finding that those earnings were prior to July 23.  The ALJ noted that plaintiff had additional earnings in 2007 and 2008, but they did not rise to SGA levels.  (Tr. at 37-38.)

At step two, the ALJ concluded that plaintiff suffered from the severe impairments of obesity, gout, arthritis, degenerative disc disease, diabetes, status post left ankle fracture, alcohol dependence, and depression.  The ALJ found plaintiff's alleged carpal tunnel syndrome and fibromyalgia to be non-medically determinable impairments.  (Tr. at 38.)

At step three, the ALJ found that plaintiff's degenerative disc disease did not meet Listing 1.04 (Disorders of the Spine), her diabetes did not meet Listing 9.08, and her ankle fracture did not meet Listing 1.06.  (Tr. at 38.)  The ALJ further concluded that plaintiff's mental impairments, including her substance abuse disorder, did not meet Listings 12.04, 12.06, or 12.09.  In making this finding, the ALJ found that plaintiff had mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, and pace (when using alcohol); and no episodes of decompensation.  (Tr. at 39-40.)

The ALJ then determined that plaintiff retained the RFC to perform a range of sedentary work, with no climbing of ladders; occasional stair climbing, balancing, crouching, crawling, kneeling, and stooping; occasional exposure to humidity and wetness; and jobs involving only simple, routine tasks.  The ALJ explained that plaintiff's physical impairments (degenerative disc disease, morbid obesity, and osteoarthritis of the knees) limited her to sedentary work, and her asthma limited her to occasional exposure to

16

humidity and wetness. Due to her moderate restriction in concentration, persistence, and pace, plaintiff was limited to simple, routine tasks. (Tr. at 40.)

Based on this RFC, the ALJ concluded at step four that plaintiff was unable to perform her past work as a medical transcriptionist and clerk/typist, relying on the VE's testimony that this RFC would be more consistent with unskilled work. (Tr. at 40-41.) At step five, the ALJ concluded that Grid Rule 201.06 would direct a finding of disabled, given plaintiff's age, education, work experience, and RFC. (Tr. at 41.)

The ALJ then analyzed plaintiff's RFC if she stopped substance abuse, finding that her physical limitations would remain. (Tr. at 41-42.) However, plaintiff's mental limitations would be less severe. Specifically, the ALJ concluded that if she stopped drinking plaintiff would have only mild limitations in concentration, persistence, and pace. When not using substances, plaintiff was noted to have no delusions or memory problems, and Dr. Alami noted that plaintiff had good judgment and insight and no problems with concentration. Thus, absent substance abuse, plaintiff's mental impairments would be non-severe. (Tr. at 42.)

In finding that, absent substance abuse, plaintiff would remain limited to sedentary work physically but would not have a severe mental impairment, the ALJ also considered plaintiff's claims regarding her symptoms and the medical opinion evidence. (Tr. at 43.) After summarizing plaintiff's statements, the ALJ indicated that:

> If the claimant stopped the substance abuse, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

(Tr. at 44.)  The ALJ found that plaintiff's physical impairments limited her to sedentary work but did not render her completely disabled from physical work.  The ALJ cited Dr. Fey's notations that while plaintiff used a cane, she was able to independently get on the exam table, and imaging of the knee showed only moderate degenerative changes, for which he recommended conservative treatment.  (Tr. at 44.)  In January 2008, Dr. Krug noted a generally normal examination with no swelling or tenderness in any joint.  He also noted that plaintiff obtained pain relief from over-the-counter medications.  And in March 2009, Dr. Gallito noted that plaintiff reported significant improvement following injections to her left ankle and knee, she was ambulatory, and she reported no acute pain in her knees or ankles.  (Tr. at 45.)  The ALJ also considered plaintiff's obesity, finding that the RFC accounted for any limitations related to this condition.  The ALJ noted that none of plaintiff's doctors noted functional impairment due to obesity; however, the ALJ limited her to no climbing as a result of this condition.  (Tr. at 45.)

Overall, the ALJ found plaintiff's allegations of disabling symptoms "less than credible."  (Tr. at 45.)  In support, he noted evidence that plaintiff worked following the alleged onset date, including a 2008 note indicating she had started a new full-time job.  The ALJ also noted conflicting accounts of why plaintiff stopped working: in October 2006, plaintiff said she quit her job after her pay was lowered; in January 2007, she indicated that she lost her job after changes were made to the program she worked for; and in March 2009, she indicated that she had lost jobs due to alcohol use.  In November 2008, plaintiff stated in mental health therapy that she had lost jobs previously due to mistakes she made while hungover.  (Tr. at 45.)  The ALJ further noted plaintiff's varying accounts as to why she believed herself unable to work.  In July 2008, plaintiff indicated that she did not

18

consider herself "acutely ill" other than fibromyalgia flares.  In October 2008, Dr. Gordon noted that plaintiff was well-looking, had no tenderness to palpation in her left ankle, and was able to resume normal activities with no limitations.  The ALJ considered plaintiff's work history, which, to her credit, showed earnings over a number of years consistent with competitive full-time employment.  However, this did not support a finding of disability absent evidence of disabling symptoms and limitations.  (Tr. at 45.)

The ALJ afforded great weight to Dr. Merrick's opinion that plaintiff had mild mental limitations when not using substances, as that opinion was generally consistent with the weight of the medical evidence.  (Tr. at 45-46.)  The ALJ also considered the opinions of Dr. Muceno, limiting plaintiff to sedentary work with no further limitations, and Dr. Khorshidi, finding her capable of light work, but the ALJ found plaintiff more limited based on the medical evidence at the time of the hearing.  (Tr. at 46.)[4]

Finally, the ALJ concluded that if plaintiff stopped the substance abuse (which would remove the restriction to simple, routine tasks), she would be able to perform her past relevant work as a medical transcriptionist or clerk/typist, both semi-skilled positions.  (Tr. at 46.)  The ALJ accordingly concluded that because plaintiff would not be disabled if she stopped substance abuse, her substance abuse was a contributing factor material to the determination of disability.  Therefore, he found her not disabled.  (Tr. at 47.)[5]

---

[4]At the hearing, plaintiff's representative suggested limitations in fingering, grasping, and reaching, but the ALJ found no medical support for such limitations.  Although the record contained notations of possible carpal tunnel syndrome, there were no objective medical findings from testing to confirm such a diagnosis.  (Tr. at 46.)

[5]With her request for Appeals Council review, plaintiff submitted additional medical record from July 2009 on, including evidence relating to carpal tunnel syndrome.  (Tr. at 349.)  However, the correctness of an ALJ's decision depends on the evidence that was

## II. DISCUSSION

### A.   Standard of Review

The court reviews an ALJ's decision to deny benefits to determine whether it was supported by substantial evidence or was the result of an error of law. Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013). Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the ALJ's. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence. Pepper, 712 F.3d at 362.

### B.   Analysis

#### 1.   Substance Abuse

As indicated above, if a social security claimant's alcohol or drug abuse is the cause of her disability, she is barred by statute from obtaining benefits. Kangail, 454 F.3d at 628 (citing 42 U.S.C. 423(d)(2)(C)). The regulations explain that, when confronted with a case involving substance abuse, the ALJ must determine whether he would still find the claimant disabled if she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b). In making this determination, the ALJ must evaluate which of the claimant's current physical and mental limitations would remain if she stopped using drugs or alcohol and then determine whether any or all of her remaining limitations would be disabling. Id. If the ALJ determines that

---

before him; he cannot be faulted for failing to weigh evidence never presented to him. Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).

the claimant's remaining limitations would not be disabling, then he will find that drug addiction or alcoholism is a contributing factor material to the determination of disability. Id.

In this case, the ALJ found that, when using alcohol, plaintiff had a moderate restriction in concentration, persistence, and pace, which limited her to simple, routine tasks (Tr. at 40), thus precluding her past work (Tr. at 41). In making this finding, the ALJ noted plaintiff's hearing testimony that she was unable to type fast enough to make a living in her past work; her statement to one of her providers in March 2009 that she has always had difficulty with concentration and memory; and her "somewhat impaired" concentration during an October 2006 examination. However, the ALJ also cited record notations that plaintiff had lost employment in the past due to mistakes she was making while hungover from alcohol use. Based on this evidence, the ALJ found that plaintiff, when using alcohol, had a moderate restriction in maintaining concentration, persistence, and pace, but that her restriction did not rise to the level of a marked difficulty in this domain of functioning. (Tr. at 39.)

The ALJ then performed the § 404.1535 analysis, finding that, absent the substance abuse, plaintiff's physical limitations would remain the same but that her mental limitations would be less severe. Specifically, the ALJ found that plaintiff would have only a mild limitation in concentration, persistence, and pace. The ALJ indicated that, when not using substances, plaintiff was noted to have no delusions or memory problems. Specifically, Dr. Alami noted during a period of sobriety that plaintiff had good judgment and insight, and no problems with concentration. (Tr. at 42.) The ALJ further noted that in March 2009 plaintiff told one of her providers that she had lost jobs as a result of alcohol use, and in

21

November 2008 plaintiff stated during mental health therapy that she had lost jobs previously due to mistakes she made while hungover. Finally, the ALJ relied on the reports of Drs. Merrick and Bauer that plaintiff had only mild mental limitations when not using substances. (Tr. at 45.)

Plaintiff argues that the ALJ overlooked evidence suggesting that she had difficulties concentrating regardless of her alcohol use. She cites statements in her disability reports that she had a hard time concentrating on tasks (Tr. at 234) and that her anxiety and depression caused loss of concentration with hopelessness and catatonic staring into space (Tr. at 307). Plaintiff also notes that she reported concentration problems to a psychologist (Tr. at 599) and counselor (Tr. at 893), and that in October 2006 Dr. Fields, a psychiatrist, noted that her concentration was "somewhat impaired." (Tr. at 1061.)

As indicated, the ALJ need not discuss every piece of evidence in the record; rather, he is prohibited only from ignoring an entire line of evidence that supports a finding of disability. Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ did not ignore any lines of evidence in this case. He considered plaintiff's statements regarding her limitations, finding them "less than credible." (Tr. at 45.) The ALJ specifically considered the counseling record plaintiff cites (Tr. at 45, citing Ex. 33F), for it was in that record that plaintiff also reported "that she has been fired from a number of jobs as a result of her drinking." (Tr. at 893.)[6] The ALJ also specifically cited the October 2006 examination

_____

[6]It is true that in that record plaintiff stated she "has always had a problem with concentrating and at times has some memory problems." (Tr. at 893.) However, the very next sentence states: "She is not sure if this is a result of any mental health or drinking." (Tr. at 893.) It is also true that plaintiff reported poor concentration and various other symptoms to a psychologist, Dr. DeRocher, but this was in November 2005 (Tr. at 599), about nine months before the alleged onset date. I cannot conclude that the ALJ erred in

finding of "somewhat impaired" concentration.  (Tr. at 39, 1061.)  However, the ALJ reasonably concluded, based on plaintiff's admission in later records that she had lost employment in the past due to mistakes she made when hungover (Tr. at 39, 902) and had been fired from a number of jobs as a result of her drinking (Tr. at 45, 893), that her concentration problems would be less severe if she stopped drinking.  Plaintiff contends that at no time did she testify to, or a doctor report, that she had difficulties with concentration specifically <u>because</u> of alcohol abuse, but the ALJ was allowed to draw this inference from the evidence.  <u>See</u> <u>Stevenson v. Chater</u>, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The ALJ was entitled to make reasonable inferences from the evidence before him[.]").

Plaintiff cites cases holding that when the restrictions and limitations imposed by a substance abuse disorder cannot be "disentangled" from those imposed by another mental disorder a finding of not material is appropriate.  <u>See</u> <u>Christidis v. Massanari</u>, No. 00 C 50412, 2001 WL 1160846, at *9 (N.D. Ill. Oct. 1, 2001); <u>see also</u> <u>Jarmon v. Barnhart</u>, No. 02 C 3702, 2004 WL 742080, at *8 (N.D. Ill. Apr. 1, 2004).  In <u>Christidis</u>, however, the ALJ improperly rejected a doctor's report (the only relevant information in the record regarding the claimant's depression) in which the doctor stated that he could not determine whether or not the claimant's depression was a primary disorder.  <u>Id.</u> at *11.  The record in this case contains no such report.  In <u>Jarmon</u>, the ALJ found that substance abuse was the claimant's "primary problem," disregarding his other psychological problems.  <u>Id.</u> at *8.  The ALJ made no similar error here; he followed the requirements of 20 C.F.R. § 404.1535,

---

failing to specifically discuss this record.

giving full consideration to plaintiff's other mental impairments and the limitations they independently imposed.

Plaintiff argues that the ALJ relied on a single treatment note to find her substance abuse material, but that is not the case.  As indicated, the ALJ relied on separate statements that plaintiff had lost jobs as a result of alcohol abuse and that she made mistakes while hungover.  (Tr. at 45, 893, 902.)  The ALJ also cited evidence that, when not using substances, plaintiff had no delusions or memory problems, with Dr. Alami noting good concentration.  (Tr. at 42, 956.)  Plaintiff argues that the ALJ erred in relying on the note from Elizabeth Byler, MA, LPC (Tr. at 902), because Byler is not an "acceptable medical source."  See 20 C.F.R. § 404.1513(a) (explaining that "acceptable medical sources," such as licensed physicians and psychologists, are required to establish a medically determinable impairment).  The ALJ did not cite this note for Byler's medical opinion but rather for plaintiff's admission that she lost jobs because she made mistakes while hungover.  Plaintiff does not contend that Byler mis-quoted what she said or otherwise deny the truth of the statement.  In any event, even if the ALJ did rely on Byler's assessment of plaintiff's condition, there was no error, as opinions from "other sources" such as therapists are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p.

Plaintiff contends that the ALJ failed to fully consider the independent effects of her depression and anxiety.  She cites notes from Dr. Alami that she drank to deal with pain after breaking her ankle (Tr. at 984), and from Dr. Broome noting her long-standing history of recurrent depressive episodes (Tr. at 1038), but she fails to explain how the ALJ

committed reversible error in failing to discuss these notes.[7]  As indicated, the ALJ need

not provide a written evaluation of every piece of evidence but instead must minimally

articulate his reasons and make a bridge between the evidence and the outcome.  Rice,

384 F.3d at 371.  As the ALJ noted, Dr. Alimi specifically found that plaintiff had good

memory and concentration during a sustained period of sobriety.  (Tr. at 42, 956.)

Finally, plaintiff argues that the ALJ relied on no medical evidence to establish

materiality, but that is also incorrect, as the ALJ specifically cited the reports of Drs. Merrick

and Bauer on this issue.  (Tr. at 45.)  "State agency medical and psychological consultants

are highly qualified physicians and psychologists who are experts in the evaluation of the

medical issues in disability claims under the Act."  SSR 96-6p; see also Flener ex rel.

Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely

on the opinions of physicians and psychologists who are also experts in social security

disability evaluation.").  Plaintiff argues that it is unclear whether Dr. Merrick considered her

substance abuse, but given the manner in which the doctor completed his report it was

reasonable for the ALJ to assume that he did.  Dr. Merrick checked the boxes for Affective

Disorders and Anxiety-Related Disorders, but not Substance Addiction Disorders.  (Tr. at

629, 632, 634, 637.)  Plaintiff notes that Dr. Merrick provided only a checkbox report with

---

[7]Plaintiff cites Kangail, 454 F.3d at 629, for the proposition that bipolar disorder can precipitate substance abuse (for example, as a means of alleviating symptoms), and that the aggravation of mental illness by substance abuse does not mean that the mental illness itself is not disabling.  Plaintiff cites no evidence that she abused alcohol as a means of dealing with the symptoms of mental illness (as opposed to physical pain); nor did the ALJ fail to appreciate that plaintiff's mental illness – even if aggravated by substance abuse – could still be disabling on its own.  As indicated in the text, the ALJ complied with 20 C.F.R. 404.1535, and I may not on judicial review second guess his assessment of the evidence.

no narrative discussion, but plaintiff provided no contrary report.  In the absence of such evidence, it was reasonable for the ALJ to rely on Dr. Merrick; he was not required to summon a medical expert or order a consultative examination.  See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004).

### 2.    RFC

RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities, despite her impairments, on a regular and continuing basis. SSR 96-8p.  In setting RFC, the ALJ considers both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacities include the claimant's ability to perform each of seven strength demands – sitting, standing, walking, lifting, carrying, pushing, and pulling.  After determining the claimant's capacity in each demand, the ALJ will assign an exertional category, e.g., sedentary, light, medium, or heavy.  Non-exertional capacity includes all work-related functions that do not depend on physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities.  SSR 96-8p.  In determining RFC, the ALJ "must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation."  Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). Further, if the ALJ relies on VE testimony at steps four or five, he ordinarily must include in his hypothetical questions all limitations supported by medical evidence in the record. Simila v. Astrue, 573 F.3d 503, 520 (7th Cir. 2009).

In this case, the ALJ determined that plaintiff retained the RFC to perform sedentary

work, with the following specific limitations: lifting up to ten pounds occasionally, five pounds frequently; standing up to two hours and sitting up to six hours in an eight-hour workday; no climbing of ladders; occasional stair climbing, balancing, crouching, crawling, kneeling, and stooping; and occasional exposure to humidity and wetness. The ALJ indicated that plaintiff's degenerative disc disease, morbid obesity, and osteoarthritis of the knees limited her to sedentary work, while her asthma required a limitation to occasional exposure to humidity and wetness. (Tr. at 40.)

Plaintiff first argues that the ALJ failed to consider her fibromyalgia. The ALJ found plaintiff's fibromyalgia non-severe based on the absence of evidence in the record of this diagnosis by an acceptable medical source and supported by objective medical testing. (Tr. at 38.) Plaintiff notes that in January 2003, Dr. Moore, a rheumatologist, found on exam that plaintiff had fourteen "trigger points" for fibromyalgia. See Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (explaining a patient may be diagnosed with fibromyalgia if she exhibits at least eleven of eighteen fixed tender spots). The problem with this evidence is that it pre-dates the alleged onset date by more than three years. Plaintiff indicates that Dr. James Berquist diagnosed fibromyalgia on July 3, 2008 (Tr. at 808),[8] and Dr. Gallito on September 29, 2008 (Tr. at 987). While these physicians included fibromyalgia among the list of conditions in the "assessment" section of their notes, it does not appear that either performed trigger point testing. Thus, it was reasonable for the ALJ to find that no acceptable medical source diagnosed this condition based on objective medical testing

---

[8]Dr. Berquist saw plaintiff in the emergency department after she broke her ankle. (Tr. at 807.)

during the relevant time.[9]  Plaintiff saw Dr. Hollis Krug, a rheumatologist, for a consult in

January 2008, but as the ALJ noted, plaintiff had a generally normal exam with no swelling

or tenderness.  (Tr. at 45, 947.)  Her only specific complaint was of pain in the right arm,

for which she obtained relief from over-the-counter Ibuprofen.  (Tr. at 45, 947.)  Dr. Krug

diagnosed "tennis elbow," for which he prescribed a right forearm band.  Despite plaintiff's

statement that she had been diagnosed with fibromyalgia three to four years previously (Tr.

at 944), Dr. Krug made no further treatment recommendations and saw no need for her to

return to the rheumatology clinic (Tr. at 948-49).

In any event, even if the ALJ erred in finding plaintiff's fibromyalgia non-severe at

step two, remand would be required only if the ALJ failed to include all appropriate

limitations in the RFC.  See Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012); Castile v.

Astrue, 617 F.3d 923, 926-27 (7th Cir. 2010).  In formulating RFC in this case, the ALJ

relied in part on the reports of Drs. Muceno and Khorshidi (Tr. at 46), both of whom

specifically considered fibromyalgia.  (Tr. at 643, 655.)  Dr. Muceno found plaintiff limited

to sedentary work, with no further limitations, while Dr. Khorshidi found plaintiff capable of

light work.  The ALJ found plaintiff somewhat more limited than the consultants, based on

---

[9]In reply, plaintiff argues that because the ALJ did not rely on Dr. Berquist and Dr. Gallito's records on this issue, the Commissioner's discussion of the records violates the Chenery bar on post-hoc defenses of the ALJ's decision.  See Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012) ("Under the Chenery doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.").  But is was plaintiff who cited these notes as evidence in support of her claim.  "A social security claimant cannot . . . accuse an ALJ of skipping medical records, then raise Chenery as a bar to any consideration by the Commissioner or the court of the importance of those records."  Schurr v. Colvin, No. 12-C-0969, 2013 WL 1949615, at *14 n.10 (E.D. Wis. May 9, 2013).  Because these records do not contradict the ALJ's conclusion, there is no point in remanding so that he may explicitly discuss them.

the medical evidence of record at the time of the hearing (Tr. at 46), and plaintiff cites no medical evidence suggesting even greater limitations based on fibromyalgia. See Skarbek, 390 F.3d at 504 (finding no error based on the ALJ's failure to specifically discuss obesity where the ALJ adopted limitations suggested by the reviewing doctors, who had considered it).

Plaintiff next argues that the ALJ failed to consider her limitations in sitting, but she cites no medical evidence documenting greater restrictions.   She cites records documenting spinal stenosis (Tr. at 491) and "sharp pain in the groin and low back upon standing from sitting which may be consistent with iliopsoas spasm." (Tr. at 493.)  But these records are from 2002, four years before the alleged onset date.  In any event, they document no specific sitting limitations.  Plaintiff cites her own testimony of problems sitting (Tr. at 58-59), but the ALJ specifically considered that testimony (Tr. at 44), finding her allegations of disabling symptoms less than credible (Tr. at 45).  The ALJ also relied on the reports of the state agency reviewing physicians in finding that she retained the ability to sit as required for sedentary work.  (Tr. at 46.)

Plaintiff further argues that, while the ALJ limited her to no climbing, he did not find any limitations in sitting due to her obesity.  As the ALJ noted, however, none of plaintiff's treatment providers noted any functional limitations due to obesity (Tr. at 45), and plaintiff cites no such evidence now.  Plaintiff cites Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), but in that case the ALJ failed to consider the claimant's obesity, unlike in the present case.  Villano does not stand for the proposition that an obese claimant with arthritis can never meet the sitting requirements of sedentary work.  Plaintiff also argues that the ALJ failed to properly consider obesity at step three, namely, whether her obesity

served as a substitute for the criteria in Listing 1.04.  The ALJ specifically determined that plaintiff did not meet Listing 1.04 because she did not have ongoing evidence of compromise of a nerve root or spinal cord; nor did she have positive straight-leg raising both sitting and supine.  (Tr. at 38.)  Plaintiff cites evidence of spinal stenosis at the L3-L4 level resulting in mass effect on traversing lumbosacral nerve roots (Tr. at 491), but that record is dated October 4, 2002 (Tr. at 491), about four years before the alleged onset date.  Plaintiff makes no effort to demonstrate how she meets the other criteria of the Listing, as it is her burden to do.  See Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) ("The claimant bears the burden of proving his condition meets or equals a listed impairment.").  Although obesity may in some cases meet or equal the criteria of a particular Listing, the ALJ may not "make assumptions about the severity or functional effects of obesity combined with other impairments.  [The ALJ must] evaluate each case based on the information in the case record."  SSR 02-01p.  Plaintiff makes no attempt to demonstrate how her obesity meets or equals Listing 1.04.

Plaintiff's final RFC argument gains traction.  Plaintiff notes that the ALJ found mild limitations in concentration, persistence, and pace (independent of substance abuse), yet failed to incorporate any such limitations into the RFC.  "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment."  Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010); see also O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases generally have required the ALJ to orient the VE to the totality of a claimant's limitations.  Among the limitations the VE must consider are deficiencies of concentration, persistence and pace.") (footnote omitted).  Courts in this

circuit have consistently held that an ALJ's unexplained failure to include even mild limitations in concentration, persistence, and pace in the RFC warrants remand. See, e.g., Underwood v. Colvin, No. 2:11-CV-354, 2013 WL 2420874, at *2 (N.D. Ind. May 30, 2013); Dross-Swart v. Astrue, 872 F. Supp. 2d 780, 795 (N.D. Ind. 2012); Baker v. Astrue, No. 4:10-CV-00066, 2011 WL 3585613, at *5-6 (S.D. Ind. Aug. 15, 2011); Alesia v. Astrue, 789 F. Supp. 2d 921, 933-34 (N.D. Ill. 2011); see also Kramer v. Astrue, No. CV 12-5297, 2013 WL 256790, at *3 (C.D. Cal. Jan. 22, 2013); Harmon v. Astrue, No. 10-6781, 2012 WL 94617, at *1-2 (E.D. Pa. Jan. 11, 2012); Garver v. Astrue, No. 09-cv-02259, 2011 WL 1134721, at *12 (D. Colo. Mar. 28, 2011); Tusken v. Astrue, No. 4:08-CV-657, 2010 WL 2891076, at *12 (N.D. Tex. May 25, 2010), adopted, 2010 WL 2891075 (N.D.Tex. July 20, 2010).  Inclusion of such limitations is particularly important when the ALJ considers the claimant's ability to perform past semi-skilled or skilled work, as even mild limitations may preclude such work.  See Alesia, 789 F. Supp. 2d at 934.  Here, the VE testified that plaintiff's past work was semi-skilled, but the DOT code he cited for the medical transcriptionist job (201.362-014) refers to a skilled job.[10]  The clerk-typist position has, per the DOT code the VE gave (203.362-010), an SVP of 4,[11] placing it at the top of the semi-skilled range.  See SSR 00-04p.  The matter must be remanded so the ALJ may explore these issues.[12]

_____

[10]http://www.occupationalinfo.org/20/201362014.html.

[11]http://www.occupationalinfo.org/20/203362010.html.

[12]On page 7 of her brief, the Commissioner argues that the ALJ reasonably did not put a mild social functioning limitation into the RFC, but the Commissioner fails to specifically respond to plaintiff's argument regarding mild limitations in concentration, persistence, and pace.  See Kinley v. Astrue, No. 1:12-cv-740, 2013 WL 494122, at *3

### 3.    Credibility

In evaluating the credibility of a claimant's statements regarding pain or other symptoms, the ALJ must first determine whether the claimant has a medically determinable physical or mental impairment that could reasonably be expected to produce her symptoms.  If she does not, the symptoms cannot be found to affect her ability to perform basic work activities.  SSR 96-7p.  In the claimant does have such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit her ability to perform basic work activities.  If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of her statements based on the entire case record.  SSR 96-7p; 20 C.F.R. § 404.1529(c).  The ALJ must provide "specific reasons" for his credibility findings, supported by the evidence in the record.  SSR 96-7p.  If he does so, his determinations will be afforded special deference, and the court will not overturn them unless they are "patently wrong."  Jones, 623 F.3d at 1160.

As plaintiff notes, the ALJ began her credibility analysis in this case with this piece of boilerplate:

> If the claimant stopped the substance abuse, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

(S.D. Ind. Feb. 8, 2013) ("The Commissioner does not respond to this argument, and it is unclear whether this is a tacit admission by the Commissioner that the ALJ erred or whether it was an oversight.  Either way, the Commissioner has waived any response."). In any event, because the ALJ must consider the combined effects of all impairments in setting RFC, it is no answer to say that because a non-severe impairment does not,  by itself, significantly affect a person's functioning it need not be factored into the RFC.

residual functional capacity assessment for the reasons explained below.

(Tr. at 44.)  The Seventh Circuit has criticized this "template" as unhelpful, explaining that it backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility.  Shauger, 675 F.3d at 696.  "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing."  Id.

However, use of the template may be deemed harmless if the ALJ goes on to provide specific reasons for his finding.  See Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Shideler, 688 F.3d at 311-12.  The ALJ did so here.  First, the ALJ cited evidence that plaintiff worked following the alleged onset date, including a note from Dr. Alami in May [sic] 2008 that she had started a new full-time job.  Second, the ALJ noted conflicting accounts of why plaintiff stopped working: in October 2006, plaintiff said she quit her job after her pay was lowered; in January 2007, she indicated that she lost her job after changes were made to the program she worked for; and in March 2009, she told one of her providers that she had lost jobs due to alcohol use.  In November 2008, she stated in mental health therapy that she had lost jobs previously due to mistakes she made while hungover.  (Tr. at 45.)  Third, the ALJ noted that there were varying accounts as to whether plaintiff (and her doctors) believed her unable to work.  In July 2008, plaintiff stated to a provider that she does not consider herself acutely ill other that fibromyalgia flares, and in October 2008, Dr. Gordon noted that plaintiff was well-looking, had no tenderness to palpation in her left ankle, and was able to resume normal activities with no limitations.  Finally, ALJ considered plaintiff's work history, which, to her credit, showed earnings over a number of years consistent with competitive full-time employment.  However, this did not

support a finding of disability absent evidence of disabling symptoms and limitations. (Tr. at 45.)

Plaintiff attacks each of these reasons, but it is not my job to second guess the ALJ or make independent credibility findings. See Shideler, 688 F.3d at 310. The ALJ reasonably considered plaintiff's report to Dr. Alami in March (not May) 2008 that she had obtained a full-time job. (Tr. at 1009.) On May 5, 2008, plaintiff told Dr. Gallito that she lost her job about a month ago (Tr. at 1004), but the note does not indicate that she lost the job due to her impairments; rather, she was noted to be doing well aside from some left lower quadrant pain over the past three to four days. (Tr. at 1003.) Plaintiff also reported the job loss to Dr. Alami in June 2008, stating that for several days afterward she felt sad and angry. (Tr. at 1000.) But that note also contains nothing indicating that plaintiff lost the job due to her impairments. While the fact that someone is employed is not proof positive that she is not disabled, Wilder v. Chater, 64 F.3d 335, 338 (7th Cir. 1995), the ALJ may reasonably consider as part of his analysis the claimant's continued work after the alleged onset date, see, e.g., Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008).

It was also reasonable for the ALJ to consider plaintiff's shifting accounts as to why she lost her jobs[13] and whether she believed herself able to work. See SSR 96-7p ("One

---

[13]Plaintiff argues in reply that the ALJ failed to resolve the inconsistencies and did not elicit an explanation from plaintiff regarding her varying accounts of job loss. That the ALJ must resolve material inconsistencies in the record, see SSR 96-8p, does not mean that he must choose between a claimant's conflicting statements cited for their very lack of consistency. See SSR 96-7p ("The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record.").

strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). Plaintiff contends that her statement that she was not "acutely" ill during the July 2008 exam cannot be deemed an admission that she was able to work, but the ALJ did not claim that it was; rather, he cited this as a prior inconsistent statement. Plaintiff also contends that Dr. Gordon's October 2008 exam, after which he released her to normal activities with no limitations, pertained only to her ankle. However, it was not unreasonable for the ALJ to consider this as one factor in his analysis.

Plaintiff argues that the ALJ failed to mention other records in which she complained of pain and depression. As indicated, however, the ALJ is not required to discuss every piece of evidence in the record, and he adequately considered plaintiff's complaints of pain due to osteoarthritis and fibromyalgia, the conditions to which she attributed her pain at the hearing. (Tr. at 44, 62.) The ALJ also considered plaintiff's complaint of poor circulation in her legs following her lumbar back surgery. (Tr. at 44, 59.) Plaintiff again refers to lumbar spine stenosis (Tr. at 490-91), but as indicated above those records pre-date the alleged onset date by several years, and the ALJ considered the problems plaintiff alluded to at the hearing. Plaintiff notes that pain cannot be shown via objective tests, but this does not mean that an ALJ is forbidden to note, as part of his analysis, the absence of objective support for claims of disabling pain. (Tr. at 44-45.) In sum, the ALJ's credibility determination has some support in the record, and plaintiff fails to show that it is patently wrong. See Schmidt v. Astrue, 496 F.3d 833, 843 (7th Cir. 2007).

35

### III.  CONCLUSION

While most of plaintiff's allegations of error fail, the matter must be remanded for consideration of plaintiff's mild mental limitations, even when sober, in determining RFC and her ability to perform past skilled or semi-skilled work.

**THEREFORE, IT IS ORDERED** that this matter is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of August, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

36